UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMES R. VADEN, III, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:06-0142 |
| ) | Judge Echols |
| ) | |
| GAP, INC., ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM

Pending before the Court are Defendant's Motion for Summary Judgment (Docket Entry No. 26) and Defendant's Motion to Strike Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts (Docket Entry No. 34), to which Plaintiff responded in opposition.

This is a race discrimination case brought by Plaintiff James R. Vaden III against his current employer, Gap, Inc. In his Complaint, Plaintiff asserted claims for disparate treatment, hostile work environment and retaliation, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e; 42 U.S.C. § 1981; and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*

At the outset, the Court will grant Defendant's Motion to Strike Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts for failure to comply with Federal Rule of Civil Procedure 56 and Local Rule 56.01. Plaintiff filed initial Responses to Defendant's Statement of Undisputed Material Facts (Docket Entry No. 32) and, after Defendant moved to strike them, Plaintiff filed Amended Responses to Defendant's Statement of Undisputed Material Facts (Docket Entry No. 35-5). Plaintiff's Amended Responses are filed as an attachment to Plaintiff's Response to Defendant's Motion to Strike (Docket Entry No. 35). The Court will strike them as well.

There are numerous reasons why Plaintiff's Responses do not comply with the Federal and Local Rules. Plaintiff's initial Responses did not include the Defendant's Statements of Undisputed Material Facts, as required by Local Rule 56.01(c) ("The response must be made on the document

1

provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant."). Some of the Responses state "Denied" without any further explanation. None of Plaintiff's initial Responses included any record citations in support. Plaintiff did not provide any deposition excerpts or documents in support of his denials. Some of Plaintiff's responses are truncated and some are missing completely.

Plaintiff did not file an affidavit or declaration supporting the facts he claims are disputed, but instead he purported to verify the Responses under oath as "true and correct to the best of his knowledge, information and belief." (Docket Entry No. 32-3.) Such a verification does not meet the requirements of Rule 56(e) because it does not establish that Plaintiff has actual personal knowledge of the matters to which he attests. Thus, he cannot oppose summary judgment on that basis. Wuliger v. Eberle, 414 F.Supp.2d 814, 818 (N.D. Ohio 2006) ("Information averred to the best of the affiant's knowledge or belief is insufficient to meet the requirements under Rule 56(e))."); Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 414 (1st Cir. 2000) (same).

In the Amended Responses Plaintiff attempts to correct some of these problems but again is unsuccessful in presenting facts in opposition to summary judgment. The Amended Responses contain some limited references to deposition testimony or documents, but these citations are incomplete or unsupported. Plaintiff still has not authenticated and produced copies of any documents on which he relies, such as an e-mail he represents was sent to him by a co-worker, Anthony Gantt, and which supports Plaintiff's position that he was subjected to race discrimination. In the Amended Responses, Plaintiff cites generally to his own deposition, stating: "See James Vaden Deposition." However, no specific pages of the Vaden Deposition are cited or provided for the Court to review. In other instances, Plaintiff cites to particular pages of a witness deposition, but he does not provide a copy of the cited page or pages.

Plaintiff provides a new Verification for his Amended Responses, which now states: "I further make oath that I have read and reviewed in their entirety my Responses, Denials and Explanations thereof filed by my counsel, and my answers/responses are my own, and are true and

correct." (Docket Entry No. 35-3.) This "verification" still does not confirm that Plaintiff's Amended Responses are founded upon his own personal knowledge, in violation of Rule 56(e). Reddy v. Good Samaritan Hosp. and Health Ctr., 137 F.Supp.2d 948, 956 (S.D. Ohio 2000).

Some of Plaintiff's "verified" Responses and Amended Responses appear to contradict directly his own sworn deposition testimony. Plaintiff cannot overcome a motion for summary judgment by contradicting his own previous testimony in an effort to create a factual dispute for trial. See Penny v. United Parcel Serv., 128 F.3d 408, 415 (6th Cir. 1997).

The explanations following some of Plaintiff's "Denials" are confusing in that they appear to agree to some extent with the undisputed statement of fact set forth by Defendant. Additionally, the initial copy of the Declaration of Tasha Hampton, submitted by Plaintiff, did not contain the declarant's signature. (Docket Entry No. 32-2.) After Defendant moved to strike, the Plaintiff submitted a signed Affidavit of Tasha Hampton, but the notarization appears to have been cut and pasted below Hampton's signature.

"Rule 56(e) provides that affidavits used to support or oppose a motion for summary judgment, 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" Collazos-Cruz v. United States, 117 F.3d 1420, 1997 WL 377037 at *7 (6th Cir. 1997) (unpublished). Affidavits which do not comply with the requirements of Rule 56(e) are subject to a motion to strike. Id. Hampton's Affidavit includes summary conclusions, opinions, and hearsay, none of which is admissible evidence. See Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 968-969 (6th Cir. 1991).

In light of the numerous shortcomings in Plaintiff's filings in opposition to summary judgment, the Court will grant Defendant's Motion to Strike and strike Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts (Docket Entry No. 32), Plaintiff's Amended Responses to Defendant's Statement of Undisputed Material Facts (Docket Entry No. 35-5), and

3

Tasha Hampton's Affidavit (Docket Entry No. 35-9) for failure to comply with Rule 56 and Local Rule 56.01.

## I. FACTS

The record before the Court is that which Defendant has produced. Defendant Gap's Gallatin, Tennessee Campus is a distribution center that receives and distributes merchandise for Gap and Old Navy to retailers throughout the Southeast. One of the hourly associate positions at the Gallatin Campus is Merchandise Handler. Individuals who hold this position are responsible for pulling Gap merchandise and loading it onto tractor-trailers for distribution. They also engage in data entry and generally ensure that merchandise is shipped to Gap's retailers. Some Merchandise Handlers take on roles and responsibilities in addition to their normal duties. One such role involves clerical responsibilities. A person performing clerical duties in the Shipping Department loads tractor-trailers with merchandise, communicates trailer needs to campus transportation, sets up shipping docks, closes trailers, tracks information regarding trailer issues, and completes certain administrative tasks.

Plaintiff Vaden, an African American, began working at the Gallatin Campus in 1999 as a Merchandise Handler. For most of his tenure, Vaden has worked at the Tennessee Distribution Center ("TDC") as a Merchandise Handler on first shift in the Shipping Department. Vaden has taken on roles in addition to his regular Merchandise Handler duties, such as serving on the safety committee and a task force committee charged with making recommendations about the performance appraisal process. Vaden began serving as a Skills Based Instructor ("SBI") trainer in 2003 after he applied for and was selected for the role. An SBI trainer instructs new associates how to do certain job functions. Vaden is currently the only SBI trainer for all three shifts in the TDC Shipping Department. Vaden also serves as a Powered Industrial Vehicles ("PIV") trainer to train and certify others in the safe operation of forklifts. In addition, Vaden has taken on clerical duties. His pay rate, title, and benefits have remained the same despite his extra duties, but Vaden

claims he earned thirty minutes of overtime pay each day for taking on the clerical role. (Docket Entry No. 26-3, Vaden Depo. at 170.)

In 2003, Vern Deckard, a Causasian, worked as a Merchandise Handler in the TDC first shift Shipping Department with Vaden. Deckard performed the clerical duties and Vaden was the "backup clerical," performing the role as needed. In approximately March 2003, Deckard was injured and out of work for a period of time. Kevin Hart, Facility Director for the TDC, approached Vaden and asked him to perform the clerical role while Deckard was out of work, and Vaden agreed. Vaden spent approximately fifty percent (50%) of his time performing clerical duties and fifty percent (50%) performing regular Merchandise Handler duties.

In late 2003, TDC management wanted to minimize indirect time (that is, time not devoted to productivity) in the Shipping Department. Thus, TDC management, in consultation with Human Resources, decided that the assistant supervisor would assume the clerical duties so that Merchandise Handlers could devote more time to moving cartons and increase productivity. This change occurred on first and second shift. There was no third shift at the time.

Around March 2004, when Deckard returned to work, Tasha Hampton, an African American and Vaden's assistant supervisor, informed Vaden he would no longer be performing the clerical duties. She did not give Vaden an explanation; "she was just informed not to have Vaden do it." (Vaden Depo. at 185.) Vaden testified, "you got two people that are just as capable of doing the clerical position, and . . . I was told that I was not to be in the office doing any more clerical duties anymore." (Docket Entry No. 26-2, Vaden Depo. at 27.) Except to stand in for Hampton in an emergency, as Deckard did as well, Vaden has not been in the office doing clerical duty since August 2004. (Id. at 27-28, 186.) Vaden "just kind of took it but maybe the company was going in a different direction"; however, "two other buildings of the same company still [had] a clerical. I am not allowed to do the clerical, meanwhile knowing that the person on second shift is still functioning in a clerical capacity[.]" (Id. at 136-137.)

5

Hampton left Gap around February or March 2005. Chris Conquest, a Caucasian, became the new supervisor of the Shipping Department and Brian Johnson, a Caucasian, became Vaden's assistant supervisor. Johnson began performing the clerical role in addition to his assistant supervisor duties. Vaden testified that no one other than an assistant supervisor or a supervisor performed the clerical function after August 2004. (Id. at 194.) Vaden further testified that he understood that someone higher up in Gap told TDC management to assume the clerical role.

When Conquest became the new supervisor, Vaden went to Conquest with his concern about the clerical role because Vaden did not know "which way the company was going at that time." (Id. at 42.) Vaden "was just merely asking him what was going to be going on with the clerical role." (Id. at 41.) Vaden liked the clerical role and was interested in continuing to do it, "but it's just the fact that they said there would be no clerical." (Id. at 41.) Conquest told Vaden he did not know at that time what Gap was going to do. After speaking to Conquest, Vaden approached Todd Terrell, TDC Shipping Department Manager. (Id. at 50.) Terrell had taken that position around May 2004. Vaden asked Terrell "the same thing about the clerical position. The roles and responsibilities, if there was going to be one." (Id.) Terrell said he was looking into it. Vaden asked if he would be training any assistant managers or clericals, because as SBI trainer he had done so previously, but Terrell told Vaden he would not be training clericals or assistant supervisors. Vaden felt Terrell was taking roles away from him. (Id. at 51.) Vaden admitted that there were no white employees in shipping who were allowed to do training when Terrell told him that he could not. (Id. at 94.)

Gap uses an Hourly Associate Review Process ("HARP") to evaluate employees. The HARP review rates employees in different areas of job performance as well as leadership and dedication to the company. Supervisors rate employees as "Below Target," "On Target," "Above Target," or "Significantly Above Target." In April 2005, Conquest reviewed Vaden for the first time. Although Vaden admits he received a very good evaluation overall, (id. at 102-103), he was unhappy with perceived "negative comments" that Conquest made in and at the time of the HARP review. Vaden

6

looked at the comments as "ways that I could have maybe improved my performance, but from the people that it came from it just seemed like negative at that time." (Id. at 104.)

Vaden discussed these matters with Gap's Human Resources Director, Vince Woodard, an African American. (Id. at 53.) Vaden did not like Conquest's comment during discussion of the review that Vaden "needed to watch who [he] talked to in [his] department." Vaden felt the other employee had come to Vaden to talk and management should discuss any problem with that employee. Vaden was also concerned that his HARP review stated he was not handling issues in a timely manner and he was not using his time wisely even though his production was running at high "Above Target." Vaden also did not like a comment encouraging him to leave and return from breaks on time because he returned late from a break only once. (Id. at 104.) Vaden was also concerned that Conquest had given him a recent "occurrence" on attendance for arriving to work late, but he claimed his tardiness was Conquest's fault for not telling him the correct start time, and the "occurrence" was the first one Vaden "had ever gotten that . . . was as a result of miscommunication." (Id. at 54-55.) Vaden admits that getting the "occurrence" did not result in any discipline, but the "occurrence" could show up on the HARP review and impact Vaden's annual raise. Further, one "occurrence" would preclude him from getting an attendance incentive of $250.00 at the end of the year. (Id. at 67-68.)

Vaden told Woodard that he felt he had been discriminated against because Conquest would not tell him what Gap planned to do about the clerical role and because roles and responsibilities were taken away from him. (Id.) Vaden told Woodard, "I never felt that way before, but I don't like to accuse anyone of anything." (Id. at 58.) Vaden also testified: "I didn't want to say it was discrimination but I just didn't feel comfortable in these situations, I didn't know what else to call it." (Id. at 59.) Woodard told Vaden that he knew Vaden did not miss work. Woodard did not see a problem in getting the "occurrence" removed. (Id. at 98.)

Woodard immediately involved Teresa Torrey, who had replaced Kevin Hart as TDC Facility Director. (Id. at 18.) Vaden met with Woodard and Torrey. He discussed the issue of

7

taking away his responsibilities and Conquest's comments during his HARP review. They asked him questions about why he felt the way he did and told him they would look into his concerns. (Id. at 98-99.)

After this meeting and giving Vaden the benefit of the doubt, the "occurrence" was removed from Vaden's record. (Id. at 67; Docket Entry No. 31, Woodard Decl. ¶ 11.) Gap concluded there could have been a miscommunication between Vaden and management about the start of his shift time.

By Vaden's second quarter HARP review, Conquest thought Vaden had improved quite a bit. Vaden seemed pleased with that review. (Conquest Depo. at 41.) Vaden received a salary increase at the end of the year as a result of his good review, and not every employee received a salary increase. (Vaden Depo. at 105-106.)

Around August 2005, Gap started a third shift in the TDC with limited management staff. John Apedaile, third shift supervisor, had recently moved to the Gallatin Campus from another Gap facility and he was not entirely familiar with the TDC Shipping Department and all of its functions. (Docket Entry No. 29, Apedaile Decl. ¶ 3.) When he began supervising third shift, he normally performed the clerical role in the Shipping Department in addition to his supervisor duties. Because third shift had such a small number of management team members and he lacked knowledge regarding some Shipping Department functions, he used Merchandise Handlers to perform the clerical role at times when he was too busy, unavailable, or needed assistance. (Id. ¶ 4.) When Apedaile started third shift, Anthony Gantt, a Caucasian Merchandise Handler, worked with him and Apedaile had Gantt perform the clerical role when necessary. (Id. ¶ 5.) Vaden saw Gantt sitting at the clerical desk one morning at the end of third shift. Vaden does not know why Gantt was sitting at the clerical desk, but Vaden agreed with defense counsel that Gantt could have been performing the clerical role on this one occasion because the supervisor was not available. (Vaden Depo. at 198-199, 229-230.)

8

In late summer of 2005, TDC Shipping Department management decided to allow Merchandise Handlers to begin performing the clerical role again. (Docket Entry No. 26, Terrell Depo. at 12-13, 23; Vaden Depo. at 177.) Gap posted notices for three clerical roles, one for each of the three shifts in the TDC Shipping Department, and requested applications. Candidates could apply for all three shifts and some did, but Vaden applied only for first shift because he felt he deserved it. (Vaden Depo. at 261.) Merchandise Handlers' base salary, benefits, and overall job duties would not change, but the potential for overtime pay existed. (Vaden Depo. at 260.)

Applicants were scored in certain areas, including their year-to-date HARP score, SBI certification in the area, the number of unexcused absences year-to-date, clerical experience, performance summary year-to-date, educational background, years of service, interview rating, "task force" experience, trainer experience, participation on committees, Warehouse Management System ("WMS") knowledge, and disciplinary history. (Woodard Decl. ¶ 9.) Each objective category corresponded to a predetermined number of points, and each candidate's score was included on a matrix. After each candidate's score was calculated, certain associates, including Vaden, were chosen for an interview. (Id.)

Conquest and John Dempsey, Human Resources Generalist, interviewed each candidate. They used an interview guide and asked each person the same questions, many of which asked the applicant what he or she would do in a particular situation. After each interview, the candidate's score was recorded on the matrix.

Vaden felt he did well on his interview and gave appropriate answers to the questions. Conquest gave Vaden feedback after the interview. Conquest stated that Vaden knew the position and the responsibilities, but he did not answer the questions directly, he did not "leverage" any of his experience with Gap and instead talked about other places he had worked, and he did not give as examples any situations that had occurred at Gap even though Vaden had worked there six years. Conquest also thought Vaden lacked communication skills necessary to deal with conflict in the clerical role because Vaden stated "he would just shut down and refuse to communicate any further

9

with that person." (Conquest Depo. at 37-38.) Yet, management was interested in finding a person with good communication skills to fill the clerical role. (Id. at 38.) Vaden testified that he actually said during the interview that "if I wasn't getting anywhere with them then I would [shut down], because I didn't want to cause any conflict." (Vaden Depo. at 265.)

Brenda "Nikki" Gillespi, a Caucasian female, received the first shift clerical role, scoring 83 on the matrix while Vaden scored 76. Three other female employees scored higher than Vaden but lower than Gillespi. (Woodard Decl., Ex. 1.) When Gillespi interviewed, she was working as a clerical in the Shipping Department in another building performing the same roles and responsibilities, and she had been a back-up clerical in another department for a few years prior. During her interview, Gillespi, unlike Vaden, answered questions directly, discussed her experience as a clerical in the Shipping Department, used her clerical experience when answering the situational questions, and provided an example of when she handled conflict effectively. (Docket Entry No. 30, Conquest Decl. ¶ 6.) Debra Trail received the second shift clerical role, and Anthony Gantt received the third shift clerical role.

Conquest and Dempsey met with Vaden to discuss Gap's decision and Vaden's interview. Conquest pointed out what he thought were Vaden's interview strengths and weaknesses. (Conquest Depo. at 30-31, 37.) Vaden contends he is better qualified for the clerical role than Gillespi. (Vaden Depo. at 179, 271.) Conquest offered to mentor Vaden, as he would any other associate, but Vaden did not approach Conquest for any assistance. (Conquest Depo. at 41.) Vaden conceded there was "no impact directly, but . . . those type of positions are like stepping stones into management . . . and that's what that basically took away from me." (Vaden Depo. at 64.)

Vaden testified about two allegedly racial incidents that occurred at Gap. Brian Johnson, Vaden's assistant supervisor, who did not have authority to hire or fire Vaden, asked Vaden about a note left on a conveyor that said, "I'll be back." (Vaden Depo. at 108-109.) According to Vaden, Johnson asked him who left the note and Vaden said he did not know. Johnson then said, "Well, it's one of two things–either maintenance left it or it was Arnold Swartzenigger" [court reporter's

10

transcription]. (Id. at 108.) Vaden testified Johnson went back to his office and there was a lot of laughter.

Vaden recognized the phrase, "I'll be back," as a famous line from an Arnold Schwarzenegger movie, "The Terminator." Vaden bases his complaint on Johnson's pronunciation of Schwarzenegger's last name. (Id. at 109, 120.) The reason Johnson's comment bothered Vaden was because of a scene from the movie, "White Chicks," in which Arnold Schwarzenegger's name was "used in a way that it was bad for black people." (Id. at 111.) Vaden later approached Johnson as nicely as he could and told him he did not like Arnold Schwarzenegger because of a political decision he made in California and Vaden did not appreciate Arnold's last name at all. Johnson listened to Vaden, but he did not say anything and just nodded his head up and down. (Id. at 113.) Johnson did not have any more conversations with Vaden. When Vaden approached, Johnson would go the other way. Vaden did not complain to anyone at Gap other than Johnson, and Vaden was able to complete his job duties. (Id. at 116.)

The second instance involved Conquest, Vaden's supervisor. An associate lost his badge, which Vaden found. According to Vaden, after he found the badge, Conquest told him, "atta boy, atta boy." (Id. at 190-191.) Vaden admitted that the comment could have been in reference to a white man or a black man, and he did not complain about the comment to anyone at Gap because "they didn't really . . . consider[] anything I had said previous to that[.]" (Id. at 191-192, 257.)

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there is not a genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson

11

v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

Vaden brings claims under Title VII, § 1981, and the THRA. Race discrimination claims brought under § 1981 and the THRA are analyzed in the same fashion as a race discrimination claim brought under Title VII. Wade v. Knoxville Util. Bd., 259 F.3d 452, 464 (6th Cir. 2001).

**A. Disparate treatment**

Plaintiff claims that he was racially discriminated against when the clerical role was taken from him in 2004, when he was denied the opportunity to perform the clerical role in 2005, and when Gap removed trainer duties from him.

*1. Loss of the clerical role in 2004*

Plaintiff analyzes the loss of his clerical role in 2004 as a reduction-in-force, even though Plaintiff retained his Merchandise Handler position at all times. To meet the *prima facie* case of race discrimination due to loss of the clerical role in 2004, Plaintiff must initially establish the first three parts of the McDonnell-Douglas test: (1) he was a member of a protected class ; (2) he was qualified to perform the clerical role; and (3) he was discharged from performing that role. The

12

evidence before the Court shows that Plaintiff can satisfy each of these three elements. Plaintiff functioned in the clerical role in 2004, and there is no evidence that in 2004 Gap had any concerns about Plaintiff's communication skills.

Because Plaintiff analyzes his loss of the clerical role in 2004 as a RIF issue, Plaintiff must also produce "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out plaintiff for discharge [from the clerical role] for impermissible reasons." Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 (6th Cir. 1990); Gragg v. Somerset Tech. College, 373 F.3d 763, 767 (6th Cir. 2004). The critical issue in a RIF analysis is whether the Plaintiff has produced sufficient evidence to permit the factfinder to believe that the employer intentionally discriminated against the Plaintiff because of race. Gragg, 373 F.3d at 767-768. Plaintiff can satisfy the fourth requirement if he demonstrates that a comparable non-protected person was treated better. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998).

The evidence shows that in 2004 Gap higher management instructed TDC management to assume the clerical role on first and second shift (there was no third shift at that time) so that the Merchandise Handlers who had been doing the clerical roles could be returned to primary duty to increase productivity. Plaintiff has not presented any proof that he was impermissibly singled out for elimination of his clerical role because of his race or that Gap intentionally discriminated against him based on race. Management assumed the clerical role at TDC on both shifts. Nor has Plaintiff produced any evidence to show that Gap's asserted legitimate non-discriminatory reason for requiring managers to assume the clerical role to increase overall productivity was a pretext for race discrimination against Plaintiff. Barnes, 896 F.2d at 1465 n.10.

Plaintiff appears to claim that Anthony Gantt, a Caucasian, was allowed to continue acting in the clerical role on second shift while Plaintiff was stripped of his clerical duties on first shift. Plaintiff makes reference to an e-mail he received from Gantt confirming that he was still acting in the clerical role. Plaintiff did not produce his e-mail for the Court's review. Even assuming the e-mail exists and would have confirmed that Gantt continued in his clerical role in 2004, that is not

13

the end of the necessary proof. Plaintiff still has not shown through direct, circumstantial or statistical evidence that Gap singled him out and intentionally discriminated against him because of his race. Defendant is entitled to summary judgment on this claim.

*2. Gap's failure to choose Vaden for the clerical role in 2005*

To prevail on a claim of racially disparate treatment, Plaintiff must show (1) that he is a member of a protected group; (2) he was qualified for the position; (3) he was subject to an adverse employment action; (4) and he was rejected for the position and a person outside of the protected class was hired. Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 166 & n.12 (6th Cir. 2004).

Plaintiff has failed to produce sufficient evidence for trial to show that he was more qualified for the clerical role position than Gillespi, and that Gap denied him the clerical role due to his race. The evidence shows that Defendant Gap posted the clerical role for all three shifts in 2005 and candidates, including Vaden, applied. Vaden's initial scores were high enough to earn him an interview. However, the evidence before the Court shows that, following interviews, four women, including Gillespi, received higher total scores than Vaden did. While Defendant Gap has provided evidence that Vaden did not do well in the interview and showed a lack of needed communication skills which lowered his qualifications and scoring for the clerical role, Vaden has not produced evidence that he was equally or better qualified than Gillespi, and that Gap intentionally rejected him in favor of Gillespi because of his race. Defendant Gap is entitled to summary judgment on this claim.

*3. Removal of training duties*

Plaintiff claims that Todd Terrell told him that he could not train supervisors and clericals even though he was an SBI trainer, and Plaintiff claims this was due to his race. The record before the Court simply does not bear out the claim. Vaden admits he did train assistant supervisor Brian Johnson on the "basic functions of the floor" even after Terrell told him that he would not. (Vaden Depo. at 94-95.) Although Chris Conquest trained Johnson on the clerical portion of his duties, Vaden testified there was nothing improper about that. He was concerned only that Conquest had

14

not been there very long and "there were things Chris Conquest did not know about the SBI manual that I further had to show Mr. Brian later on in time when he made mistakes." Vaden has produced no evidence that his race was a motivating factor in Conquest's decision to train Johnson on the clerical role himself. (Id.) Moreover, Vaden was the only trainer in the Shipping Department, and no Caucasians in the Shipping Department were allowed to do training after Terrell told Vaden that he could not. (Id.) Because Vaden has not produced any evidence to generate a material issue of fact for trial that he was denied the opportunity to train others due to his race, Defendant Gap is entitled to summary judgment on this claim.

**B. Hostile work environment**

To sustain a hostile work environment claim based on comments made by his supervisors, Vaden must establish the following elements: (1) he was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999). A factfinder asked to determine if a work environment is one that a reasonable person would find hostile or abusive must consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Hafford, 183 F.3d at 512. Evaluation of the objective severity of harassment should be judged from the perspective of a reasonable person in the Plaintiff's position, considering all of the circumstances. Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. Hafford, 183 F.3d at 512. Conduct must be extreme to amount to a change in the terms and conditions of employment. Id.

15

Vaden has failed to produce sufficient evidence to create a genuine issue of material fact for trial on this fourth element of his hostile work environment claim. He identified only two incidents he claims concerned racial harassment: assistant supervisor Brian Johnson's pronunciation of Arnold Schwarzenegger's name on one occasion and supervisor Chris Conquest's use of the phrase "atta boy, atta boy" on one occasion in the context of congratulating Vaden for locating an employee's lost badge. Vaden complained to Johnson about the Arnold Schwartzenegger incident and Johnson did not make any further comments; rather, Vaden testified that Johnson avoided him altogether. Vaden did not complain to Conquest or to anyone else at Gap about Conquest's use of "atta boy, atta boy."

Taking as true that both of these incidents subjectively were offensive to Vaden, these occurrences were infrequent, isolated incidents which did not involve physical threat or intimidation. Title VII is not a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998). Vaden has not produced sufficient evidence from which a reasonable person in his position would believe that the workplace was permeated with discriminatory intimidation, ridicule and insult which was sufficiently severe or pervasive to alter the conditions of Vaden's employment. See Smith v. Leggett Wire, 220 F.3d 752, 757-760 (6th Cir. 2000).

The Sixth Circuit has affirmed grants of summary judgment in favor of defendants where more frequent and severe instances of racially harassing conduct occurred in the workplace. See Smith, 220 F.3d at 757-760; Kelly v. Senior Centers, Inc., 169 Fed.Appx. 423, 428-429 (6th Cir. 2006); Boykin v. Michigan Dept. of Corrections, 211 F.3d 1268, 2000 WL 491512 *6 (6th Cir. 2000) (unpublished); Ausler v. Pierce Hardy Real Estate, Inc., 14 F.3d 600, 1993 WL 533512 *3 (6th Cir. 1993 (unpublished). Thus, Defendant Gap is entitled to summary judgment on Vaden's hostile work environment claim.

**C. Retaliation**

Vaden believes Gap retaliated against him for complaining about discrimination by giving him a negative performance rating in June 2005. (Vaden Depo. at 207-208.) To establish a *prima*

*facie* case of retaliation, Plaintiff must show: (1) he engaged in an activity protected by Title VII; (2) Gap knew that he engaged in the protected activity; (3) thereafter, Gap took action against him that would have been materially adverse to a reasonable employee or a supervisor subjected him to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the employer's action. See Burlington Northern & Sante Fe Ry. Co. v. White, — U.S. —, 126 S.Ct. 2405, 2409 (2006); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000).

Defendant contends that Vaden cannot prove the third or fourth elements of his *prima facie* case because Vaden testified that he met with Woodard and complained about discrimination and his HARP review. Therefore, the supposedly retaliatory HARP review was completed before Vaden even complained about discrimination.

In response to Defendant's summary judgment motion, Plaintiff does not address the retaliation claim. Accordingly, Defendant has produced sufficient evidence to support its motion for summary judgment, and Plaintiff has failed to generate a genuine issue of material fact for trial. Thus, Defendant's motion for summary judgment on the retaliation claim will be granted.

## IV. CONCLUSION

Accordingly, for the reasons stated, Defendant's Motion To Strike Plaintiff's Responses To Defendant's Statement of Undisputed Material Facts (Docket Entry No. 34) will be granted and Defendant's Motion For Summary Judgment (Docket Entry No. 26) will also be granted.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE